## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## ABERDEEN DIVISION

JIMMY DEAN CARPENTER                                        PLAINTIFF

v.                                                    No. 1:18CV146-RP

ITAWAMBA CO. JAIL, ET AL.                                  DEFENDANTS

### MEMORANDUM OPINION

This matter comes before the court on the *pro se* prisoner complaint of Jimmy Dean Carpenter, who challenges the circumstances of his arrest and the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. The plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The plaintiff alleges that the defendants[1] used excessive force against him, denied him medical care, tampered with his mail, denied his access to the courts, and retaliated against him for seeking redress for grievances. The "Deputy Defendants" and the "Jail Defendants" filed separate motions for summary judgment, both groups arguing that they are cloaked with qualified immunity from suit. The plaintiff has not responded to the motions, and the deadline to do so has expired. For the reasons set forth below, the motions for summary judgment will be granted, and judgment will be entered in favor of the defendants in all respects.

---

[1] The plaintiff's claims center around two distinct periods: (1) his arrest; and (2) his pretrial detention following his arrest. His claims against four Itawamba County sheriff's deputies ("Deputy Defendants") involve only excessive force, while his claims against the Sheriff and two jail employees involve denial of adequate medical care, mail tampering, denial of access to the courts, and retaliation.

**Summary Judgment Standard**

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998).

Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992). The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA*

*Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

**Undisputed Material Facts**

The court will separate the facts in this case into the two relevant periods – Carpenter's arrest and his subsequent pretrial detention.

**Carpenter's Arrest**

In his complaint, Mr. Carpenter claims that officers beat him, let a K-9 unit dog attack him, and tasered him multiple times. Doc. 1.

**The Crime Scene**

On August 27, 2015, at approximately 6:18 p.m., Deputies Steve Gray and Tyler Gordon were dispatched to 1260 Mt. Gilead Road because of a panic alarm at the residence.[2] Deputy Gray arrived at the scene first, at approximately 6:37 p.m. Deputy Gordon arrived approximately thirty seconds afterwards.[3]

---

[2] Exhibit A, Itawamba County Sheriff's Department Criminal Case File, at DEF 2217 and 2219.

[3] *Id.* at 2217 and 2219.

Deputy Gray entered the front porch of the residence and began to knock on the front door.[4] He then walked around the residence.[5] During his walk around the residence, Deputy Gordon noticed that the telephone service line had been pulled out of the wall on the back of the house.[6] He continued around the residence, checking the windows and ultimately found a side door of the residence that was open.[7] Deputy Gordon then radioed Deputy Gray and informed him of the open side door.[8] Deputy Gray then went around the residence to the location of the open door while Deputy Gordon waited to enter the residence until Deputy Gray arrived.[9] Deputy Gordon made several verbal announcements stating "Sheriff's Department" and there was no answer.[10]

He entered the home first, and moved through the kitchen to clear the hallway.[11] After clearing the hallway, he looked right into the living room area of the residence and saw an elderly woman sitting in a recliner with blood all over her.[12] Deputy Gordon told Deputy Gray to clear the home and radio for a medic.[13] Deputy Gordon approached the elderly woman and discovered that her

---

[4] *Id.* at 2217.

[5] *Id.* at 2219.

[6] *Id.* at 2219.

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 2217.

[12] *Id.* at 2219.

[13] *Id.*

throat had been cut and she was deceased.[14] Once the residence was cleared, the Deputies exited through the side door.[15]

They radioed for investigators to come to the scene.[16] Mike Newlin, the Investigator on call, called Deputy Gordon, who gave Investigator Newlin a brief description of the crime scene.[17] Newlin told Deputy Gordon not to let anyone enter the crime scene until he arrived and to canvas the neighborhood for witnesses.[18] Deputy Gray then began to rope off the residence with crime scene tape.[19] In the meantime, Deputy Gordon walked across the street and spoke with Michael Brooks, a neighbor.[20] Mr. Brooks told him that, earlier that day, a white man with short blonde hair, had come to his home with a knife.[21] Mr. Brooks informed Deputy Gordon that he told the man to leave.[22] The man stayed on the porch briefly but then walked away.[23] As Deputy Gordon and Mr. Brooks were making their way across the street, Deputy Larry Johnson arrived.[24] A short time later, at approximately 7:01 p.m., Investigators Mike Newlin and Jason Dickenson arrived and took control of the crime scene.[25]

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at 2217; 2219.

[20] *Id.* at 2219.

[21] *Id.*

[22] *Id.* at 2217; 2220.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 2217.

Investigator Dickenson escorted medic Kelly Landre into the crime scene to verify the victim's status.[26] Investigator Newlin also requested that Deputies Gray and Gordon clear an abandoned trailer home located next to the crime scene.[27] The Deputies cleared the trailer home and encountered no one.[28]

Upon returning to the scene, Investigator Newlin told Deputies Gordon and Johnson to clear the building behind the crime scene.[29] As the Deputies approached the building, they noticed it was locked.[30] As they turned to walk away, both men heard a voice in the woods behind the scene yelling.[31] Deputies could make out the words "Lord forgive me" or "God forgive me."[32] Deputies Gordon and Johnson then radioed the other law enforcement personnel that someone was in the woods.[33] Upon learning that someone was in the woods, all law enforcement units on scene began setting up a perimeter.[34] Deputy Gordon, then, retrieved his K-9 named Bing from his patrol car.[35]

**Pursuit of the Plaintiff**

Deputy Gordon and Bing approached the wood line, with Deputy Johnson and Investigator Dickinson.[36] Deputy Gordon announced, two times, "Sheriff's department canine unit come out now

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.* at 2220.

[30] *Id.* at 2220.

[31] *Id.* at 2216; 2220.

[32] *Id.*

[33] *Id.* at 2220.

[34] *Id.* at 2217.

[35] *Id.* at 2220.

[36] *Id.* at 2215; 2220.

or you're subject to be bit."[37]  After hearing no response, the Deputies entered the wooded area.[38]

After a brief search, the Deputies began to hear yelling again.[39]  Deputy Gordon then commanded that

the subject come out of the woods now, and the subject ignored this command, too.[40]  Deputy Gordon

and Bing moved in the direction they believed the subject to be.[41]  Deputy Gordon saw the subject at a

distance of ten yards away and, again, commanded Carpenter[42] to "get on the ground" and to show his

hands.[43]  As Deputy Gordon began to get closer, he continued to give Carpenter commands and

warning him that noncompliance would result in getting bitten.[44]  Carpenter, however, refused to put

his hands higher than his waist, positioned his body away from Deputy Gordon in an aggressive

manner, said "you better not sick that dog on me," and started backing away.[45]

In the meantime, Deputy Gray and Captain Jimmy Sartin moved down a logging road to

intercept Carpenter in case he left the wooded area.[46]  Moments later, Deputy Gray and Captain Sartin

heard Deputy Gordon and Deputy Johnson giving loud verbal commands to Carpenter.[47]  Deputy

---

[37] *Id.* at 2220.

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] From this point forward, the court will refer to the suspect as "Plaintiff," "Carpenter," or "Mr. Carpenter."

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.* at 2217.

[47] *Id.*

Gray and Captain Sartin moved towards the voices.[48]  Deputy Gray reported that Carpenter was extremely combative and refused to comply with their commands.[49]

**The Arrest**

*(Dog Bite)*

As Carpenter backed away, Deputy Gordon released Bing to apprehend him.[50]  As Bing started to apprehend Carpenter, he kicked towards Bing.[51]  At that point, Bing bit Carpenter on his lower leg.[52]  Carpenter then tried to get Bing off his leg by hitting him; Bing then released Carpenter's leg and bit his arm.[53]  Bing then went back to Carpenter's leg.[54]  There is no evidence that Deputy Gordon acted to prolong Bing's interaction with Carpenter; instead, Carpenter's continued vigorous resistance to arrest extended the encounter .[55]

*(Taser)*

Although Bing had Carpenter by the leg, he continued to be combative, resisting arrest.  At that point, Deputy Gordon took out his Taser and deployed it in an attempt to subdue Carpenter.[56]  This initial shot was ineffective, however, because one of the probes did not stick.[57]  Deputy Gray

---

[48] *Id.*

[49] *Id.*

[50] *Id.* at 2220.

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).

[56] *Id.* at 2220-21.

[57] *Id.* at 2221.

then handed his Taser to Investigator Dickinson, who was able to deploy a successful shot.[58]

Carpenter nonetheless kept fighting and resisting.[59]  In their attempts to subdue and arrest Carpenter (a

potentially armed murder suspect), the Deputies began with verbal commands, then tried the K-9, then

the Taser.  None of these methods had any effect.  Instead, the Deputies had to physically subdue an

extremely combative suspect.

    *(Handcuffs)*

  Eventually, Deputy Gray was able to pull Carpenter's right arm out from underneath him.[60]

Deputy Gray placed handcuffs on Carpenter's right wrist, while other Deputies tried to retrieve his left

arm.[61]  Once the Deputies retrieved his left arm, Deputy Gray placed another set of handcuffs on his

left wrist and linked the two sets of handcuffs together.[62]  Deputy Gordon noted that Carpenter

seemed to be under the influence of drugs "because he didn't seem to feel any pain and the strength he

had considering his size and the amount of Deputies, K-9, and Taser it took to arrest him."[63]  In spite

of Carpenter's resistance and apparent drug-induced resistance to pain, Carpenter was handcuffed with

no injury.

---

[58] *Id.* at 2217-18.

[59] *Id.* at 2218; 2221;

[60] *Id.* at 2218.

[61] *Id.*

[62] *Id.*

[63] *Id.* at 2221.

Mr. Carpenter refused to walk, so Deputy Gray and Captain Sartin had to drag him out of the wooded area.[64] Carpenter was placed in Deputy Gray's patrol vehicle; then he and Investigator Dickenson transported Carpenter to the Itawamba County Jail.[65]

**Investigation at the Jail**

Chief Deputy Little instructed the officers to have a medic unit evaluate Carpenter when he arrived at the jail,[66] and, upon arrival, a medic unit was waiting.[67] He was placed in an investigation room for pictures, collection of evidence, and medical attention.[68] Investigator Dickenson took photos of Carpenter and gathered his clothes and belongings as evidence.[69] Medical attention was offer to him, as well; however, he refused it.[70] During his medical evaluation, he began yelling and appeared to be a threat to himself and the officers.[71] Deputy Gray and Investigator Dickenson placed Carpenter in a restraint chair for his safety.[72] Deputy Gray and Investigator Dickenson stayed in sight of Carpenter for a time.

**Events at the Jail**

Carpenter alleges denial of medical care, mail tampering, denial of access to the courts, and retaliation against Defendants Vicky Russell, Dwight Hill, and Chris Dickenson during his stay at the Itawamba County Jail.

---

[64] *Id.* at 2221.

[65] *Id.* at 2218.

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *Id.* at 2215.

[71] *Id.* at 2218.

[72] *Id.*

**Medical Care Provided**

Mr. Carpenter claims that the Jail Defendants denied him medical care by failing to bring him to a doctor from August 27, 2015, to December 9, 2015, for treatment of his injuries after the arrest, blood pressure issues, and liver disease. On December 5, 2015, at approximately 7:35 p.m., he submitted a medical request form stating that he had a bad headache and that it might be his blood pressure.[73] He was sent to Dr. Arriola on December 7, 2018.[74] However, Carpenter alleges that, at this visit, Dr. Arriola did not treat his high blood pressure and, instead, sent him back to jail.[75] Nonetheless, his pharmacy and medical administration records show that Dr. Arriola prescribed hypertension medicine, which was administered on December 7.[76] On December 8, 2015, Carpenter reported to Jailer Josh Hitt that he was having blurred vision, headaches, and chest pain.[77] Jailer Hitt called the paramedics, who took Carpenter's blood pressure.[78] He was ultimately taken to the hospital that same night, and received prescriptions to treat his hypertension.[79] His medication administration record shows that he began receiving his hypertension medicine on December 7, 2015.[80]

---

[73] Exhibit A - Plaintiff's Jail Medical Documents, at DEF 741.

[74] *Id.*

[75] [Doc. 1 at pg. 9].

[76] Exhibit B - Plaintiff's Patient Profile Brief, at DEF 443; Exhibit A, at DEF 773.

[77] Exhibit C - Jail Reports, at DEF 1734.

[78] *Id.*

[79] Exhibit A, at DEF 737.

[80] Exhibit A, at DEF 773.

Again, on March 3, 2016, he requested blood pressure medications due to headaches and dizzy spells.[81] He saw Dr. Arriola on March 15, 2015.[82] Carpenter's medication administration record shows that Defendants administered all medicine prescribed to him as prescribed.[83]

On June 28, 2016, he submitted a medical request stating that he had liver disease and high cholesterol.[84] He also stated that he informed Dr. Arriola "last year" but the doctor refused to help him.[85] Defendant Russell stated that she would check with Dr. Tim Evans for an appointment.[86] Carpenter saw Dr. Evans on July 14, 2016.[87] On August 27 and 28, 2015, respectively, Carpenter complained of high blood pressure and numbness in his legs.[88] He saw Dr. Evans on August 29, 2016,[89] and immediately began receiving daily krill oil pills. He continued to see Dr. Evans and received his medications regularly.[90]

**Confiscation of Letters and Pepper Spray**

On September 8, 2016, a corrections officer notified Defendant Russell that she had confiscated letters from another inmate that was in the process of bonding out.[91] The letters were

---

[81] Exhibit A, at DEF 736.

[82] *Id.*

[83] *See generally*, Exhibit A, DEF 773-840.

[84] Exhibit A, at DEF 735.

[85] *Id.* Defendants note that Plaintiff's contention is clearly that Dr. Arriola did not help him is patently untrue. Exhibit B, at DEF 443; Exhibit A, at DEF 773.

[86] *Id.*

[87] Exhibit D - Medical Records from Convenient Care of Fulton, at DEF 636.

[88] Exhibit A, at DEF 732-33.

[89] *Id.*; Exhibit D, at DEF 650.

[90] *See generally*, Exhibit D; Exhibit A, DEF 773-840; Exhibit B.

[91] Exhibit C, at DEF 1705-06.

found by the corrections officers after searching the inmate's property prior to his release on bond.[92]

The letters were written by Carpenter.[93]  These letters threatened officers.[94]  Once he discovered that

his letters had been found and confiscated, he began to "yell, cuss, beat and bang on the steel bunks in

Cell 1 of the holding area."[95] Defendant Russell then went into the holding area and saw two officers

trying to calm Carpenter down.[96]  Carpenter continued to cause a scene and began banging his head

on the steel door and screaming profanities at Defendant Russell,[97] who told him three times to stop,

but Carpenter continued.[98]  Defendant Russell then sprayed Carpenter with mace for three seconds.[99]

Carpenter was locked down in a holding cell, where he had access to water, shampoo, and towels.[100]

### Qualified Immunity

In their respective motions for summary judgment, the defendants have raised the defense

of qualified immunity.  "Government officials performing discretionary functions generally are

shielded from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  To overcome the

qualified immunity defense, a plaintiff must meet a two-pronged test.  He must first allege a

violation of a clearly established constitutional right.  *Wilkerson v. Stalder*, 329 F.3d 431, 434 (5th

---

[92] *Id.*

[93] *Id.*

[94] *Id.* at 1705.

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.* at DEF 1705-06.

[100] *Id.*

Cir. 2003); *Heitschmidt v. City of Houston*, 161 F.3d 834, 836–37 (5th Cir.1998). "To be 'clearly established' for purposes of qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In addition to alleging the violation of a clearly established constitutional right, a plaintiff must also allege facts showing that the defendant's conduct was objectively unreasonable in the light of the law established at the time of the incident. *Heitschmidt*, 161 F.3d at 836–37. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Once a defendant official raises a qualified immunity defense, it is the plaintiff's burden to rebut the defense. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). In other words, "'[o]nce an official pleads the defense of qualified immunity, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated a clearly established law.'" *Reed v. Wichita County (Estate of Henson)*, 795 F.3d 456, 462 (5th Cir. 2015) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010))

### The Deputy Defendants are Cloaked with Qualified Immunity

As to Defendants Tyler Gordon, Steven Gray, Larry Johnson, and Jason Dickenson, Mr. Carpenter claims that the Deputies violated his Fourth Amendment rights by using excessive force during his arrest. He claims that Itawamba County Sheriff's Department officers beat him, handcuffed him, held him to the ground at gunpoint, tasered him multiple times, and allowed a K-9 to bite him. Mr. Carpenter suffered some injury from the K-9; however, the Itawamba County Sheriff's Department officer's use of force was objectively reasonable under the circumstances surrounding his arrest.

**No Violation of a Constitutional Right**

Under the Fourth Amendment, "'[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .'" *Goode v. City of Southaven*, 2019 U.S. Dist. LEXIS 128983, at \*36 (N.D. Miss. May 1, 2019) (quoting U.S. Const. Amend. IV). Thus, when a plaintiff alleges excessive force "'the federal right at issue is the Fourth Amendment right against unreasonable seizures.'" *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 134 S. Ct. 1861, 1865, 188 L. Ed. 2d 895 (2014)). A violation of this Fourth Amendment right "occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph v. Bartlett*, 2020 U.S. App. LEXIS 36688, at \*18 (5th Cir. Nov. 20, 2020) (citing *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)).

**No Injuries from the Actions of Deputies Gray and Johnson**

In his Complaint, Mr. Carpenter claims only that he has "permanent damage[]" to his right leg "where dog bit [him]" and to his "left arm . . . and fingers from taser where they lied and said dog bit [him]." Doc. 1 at 9. As such, Mr. Carpenter claims injuries that resulted only from dog bites and a taser. It is undisputed that Deputy Gordon released his K-9 and deployed his taser one time. Deputy Dickinson also deployed a taser one time. However, Mr. Carpenter does not allege that he suffered any injuries other than those sustained from the dog bites and tasers; Deputies Gray and Johnson took no part in these actions. As such, Mr. Carpenter has not shown that he suffered an injury due to the actions of Deputies Gray and Johnson – and thus fails to allege a constitutional violation. Mr. Carpenter's claims regarding excessive force against Deputies Gray and Johnson will therefore be dismissed. *See Flores v. Rivas*, 2020 U.S. Dist. LEXIS 22047, at \*17 (W.D. Tex. Jan. 31, 2020) ("Because Flores does not allege that she suffered an injury, the Rivas Motion is granted with respect to her excessive force claim against him.")

**Deputy Gordon and Dickenson's Use of Force Was Reasonable**

Mr. Carpenter suffered injuries during his arrest. Hence, the court must determine whether the Itawamba County Sheriff's Department officers' use of force was objectively reasonable. The excessive force reasonableness analysis is "a 'necessarily fact-intensive' and case specific inquiry." *Id.* (quoting *Poole*, 691 F.3d at 628). As such, a reasonableness inquiry "is 'not capable of precise definition or mechanical application.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). Courts generally focus on three factors when determining if the officer's use of force was objectively unreasonable: "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Goode v. Baggett*, 811 Fed. Appx. 227, 232 (5th Cir. 2020) (quoting *Graham*, 490 U.S. at 396). Additionally, an officer's use of force "must be evaluated 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) (citing *Poole*, 691 F.3d at 627). Further, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. The court will analyze these factors for each deputy's use of force.

**Deputy Gordon's Use of K-9 Force**

Mr. Carpenter alleges that Deputy Gordon used excessive force against him by deploying the K-9 Bing. Deputy Gordon does not dispute that: (1) he released Bing to apprehend Carpenter, and (2) Bing made contact with his arm and leg. However, under the circumstances surrounding the pursuit and apprehension of Mr. Carpenter, the use of K-9 force was objectively reasonable.

In his Complaint, Mr. Carpenter alleges that "three cops, on 8-27-15 let [a] K-9 dog bite [him] all over." Doc. 1 at 9. The court will discuss the use of a K-9 to initially apprehend him and the continued use of the K-9 to subdue him until he was handcuffed

*Use of K-9 Force to Apprehend Carpenter*

To overcome the defense of qualified immunity as to his claim of excessive force, Mr. Carpenter must prove that Deputy Gordon violated a "'clearly established law at the time the challenged conduct occurred.'" *Shumpert v. City of Tupelo*, 905 F.3d 310, 321 (5th Cir. 2018) (quoting *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)). The arrest occurred on August 27, 2015, and "[a]t the time of the challenged conduct, neither the United States Supreme Court nor the Fifth Circuit Court of Appeals had addressed what constitutes reasonable use of K-9 force during an arrest." *Mohammed v. Baskins*, 2019 U.S. Dist. LEXIS 158183 (S.D. Tex. Sept. 17, 2019); *see also Shumpert*, 905 F.3d at 321-22. The Fifth Circuit addressed the issue on December 23, 2016, over a year later, in *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016); *see also Shumpert v. City of Tupelo*, 905 F.3d 310, 321-22 (5th Cir. 2018). As such, Mr. Carpenter has not shown that Deputy Gordon violated a clearly established law by releasing Bing to apprehend him during the arrest.

Nonetheless, even if *Cooper* had been the established law at the time of Mr. Carpenter's arrest, Deputy Gordon's use of force through Bing was reasonable under the circumstances of this case. The *Cooper* court held that "'when [n]o reasonable officer could conclude that [a suspect] pose[s] an immediate threat to [law enforcement officers] or others,' it is unreasonable to use K-9 force to subdue a suspect who is complying with officer instructions." *Shumpert*, 905 F.3d at 322 (quoting *Cooper*, 844 F.3d at 523).

In *Shumpert*, the Fifth Circuit determined that the officer's use of K-9 force to subdue a suspect was not in violation of clearly established law – and that the officer was entitled to qualified

immunity. *Shumpert*, 905 F.3d at 321-23. In *Shumpert*, after being pulled over for failing to use a turn signal and driving without a working tag light, the suspect ran from his car and into a neighborhood. *Id.* at 315. An officer and his K-9 unit pursued him. *Id.* The officer and the K-9 located the suspect, who was hiding in a crawl space under a house. *Id.* The officer opened the door and announced that he was the police and that he had a dog that would bite. *Id.* The officer also commanded the suspect to come out and to show him his hands. *Id.* The suspect then ran further under the home, which prompted the officer to release his K-9, who bit the suspect. *Id.* The suspect began to fight the dog and ultimately ran from under the home and tackled the officer. *Id.* at 315-16.

The Fifth Circuit distinguished these facts from those in *Cooper*, stating:

> Because it is undisputed that [the suspect] was violently resisting arrest and that Officer Cook did not know whether [the suspect] was armed, Plaintiffs have not met their burden of demonstrating that–under the discrete facts of this case–Officer Cook's use of K-9 force was objectively unreasonable in light of clearly established law.

*Id.* at 323. In light of the holdings in *Shumpert* and *Cooper*, Officer Gordon's use of force by his K-9 Bing was not objectively unreasonable.

Additionally, in *Escobar v. Montee*, the Fifth Circuit found that an officer was entitled to qualified immunity for his use of K-9 force – even though the suspect's hands were visible, and he complied with the officer's commands, the officer had "reason to doubt the suspect's compliance and still perceive a threat." 895 F.3d 387, 395 (5th Cir. 2018). In that case, the suspect had assaulted his wife and, after noticing police vehicles located at his home, absconded into the night, crossing into multiple neighbors' yards. *Id.* at 390. After searching for twenty minutes, the officers found the suspect in the back yard of a home near his own. *Id.* The officers were informed that the suspect possessed a knife and had told his mother that he would not go down without a fight. *Id.* With this knowledge, an officer deployed his K-9 unit over the fence, and the K-9 made contact with the suspect. *Id.*

Viewing the facts in the light most favorable to the suspect, the court stated that he had dropped the knife, was laying flat on the ground, did not struggle, and asked for the dog to be removed. *Id.* at 394. It was further undisputed that: (1) the knife was within the suspect's reach, (2) the officer knew of the knife and saw it was within the suspect's reach, (3) the suspect's mother informed the officers that the suspect would not go down without a fight, (4) the suspect had committed a felony assault, and (5) the suspect had fled through several backyards for twenty minutes at night. *Id.*

Based on these facts, the Fifth Circuit determined that the suspect posed a threat and that his "surrender was not genuine." *Id.* at 395. The court further reasoned that given the information from the suspect's mother and the nature of the chase that the officer's use of K-9 force was not unreasonable "because the knife remained within reach, [the officer] could reasonable believe that [the suspect]–if the dog was called off before handcuffing–would then try to harm someone." *Id.* 395-96.

In the present case, considering the totality of the circumstances from the perspective of a reasonable officer at the scene, Deputy Gordon's use of K-9 force to initially subdue Mr. Carpenter and keep him subdued until he was fully handcuffed – was reasonable. The first *Graham* factor – severity of the crime – weighs in favor of the use of K-9 force. Deputy Gordon was one of the first Deputies on the scene – and found the deceased victim of a horrific murder whose throat had been cut.[101] As such, Deputy Gordon and all other law enforcement officers at the scene were aware that Mr. Carpenter was a murder suspect.[102] This *Graham* factor clearly favors Deputy Gordon and all other officers.

---

[101] Medics on the scene confirmed that the victim was, in fact, dead.

[102] Murder is clearly a serious offense.

The second factor – whether Carpenter was an immediate threat to the officers and to the public – also favors Deputy Gordon. All deputies were aware that Carpenter was suspected of a violent murder. In addition, after speaking with the victim's neighbor, Officer Gordon was aware that a man matching Carpenter's description had been seen on the neighbor's front porch holding a knife earlier that day. As such, Deputy Gordon and all responding officers were aware that Carpenter was both violent and potentially armed. *See Shumpert*, 905 F.3d at 323 (finding that the officer's use of K-9 force was not objectively unreasonable, in part, due to the fact that the officer did not know if the Plaintiff was armed); *Escobar*, 895 F.3d at 394 (noting that "the police [had been] rightly informed that [the suspect] had committed a felony assault.")

Further, Mr. Carpenter had absconded into a wooded area behind the home, leaving the Deputies to search for him on unfamiliar ground. When they located him, after repeated announcements of police and K-9 presence and commands to get on the ground or put his hands up, Carpenter still acted in an aggressive manner, threatened the Deputies, backing up. Under these circumstances, any reasonable officer could have perceived Carpenter to be an immediate threat to the deputies.

*Use of K-9 Force to Subdue Carpenter Until He Was Cuffed*

Mr. Carpenter actively resisted arrest and attempted to evade arrest by fleeing. All Deputies reported that Mr. Carpenter continued to resist arrest until he was properly cuffed and subdued. Deputy Gordon made many announcements regarding the Sheriff's Department's presence – and that he had a K-9 and that Carpenter was subject to being bitten. Despite the many specific warnings, Mr. Carpenter did not comply.

Upon seeing the Deputies and Bing, Carpenter refused to raise his hands higher than his waist, took an aggressive posture, threatened the Deputies, and began to retreat. Further, he tried to kick and

fight the K-9 Bing – and made no attempt to comply or surrender to the Deputies. This factor, too, weighs in favor of Deputy Gordon's use of K-9 force.

Deputy Gordon knew that Carpenter was a suspect of a horrific murder – and that he was potentially armed. Deputy Gordon also knew that Carpenter had fled into the woods behind the home and was not responding to any of his announcements or commands to surrender. When the deputies located Carpenter, he still refused to follow Deputy Gordon's commands and acted in a threatening manner towards the Deputies. Under these facts and circumstances, it was objectively reasonable for Deputy Gordon to initially release Bing to subdue Plaintiff. *See Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (holding that it was objectively reasonable for an officer to use a K-9 to apprehend a potentially armed and dangerous suspect because the plaintiff was (1) suspected of committing armed robbery; (2) fled from the police; and (3) attempted to hide in a wooded area).[103]

It was also objectively reasonable under the circumstances for the K-9 to continue contact with Carpenter until he was secured and handcuffed. After Bing made initial contact, Carpenter still tried to kick him and was actively resisting arrest. Further, the deputies still did not know if he was armed – and had reason to believe that he was still in possession of a knife. As such, Deputy Gordon could reasonably believe that if Bing was called off before Carpenter was handcuffed, he could have harmed an officer. *See Escobar*, 895 F.3d at 395-96. As such, it was also reasonable to believe that Carpenter "might have attempted to flee once released by the dog." *Id.* at 396.

Deputy Gordon's use of K-9 force to initially apprehend Carpenter – and continue to subdue him until he was handcuffed – was an objectively reasonable use of force when considering the

---

[103] Though this is an Eleventh Circuit case, the Fifth Circuit cited it with approval in *Escobar v. Montee*, 895 F.3d 387, 395 (5th Cir. 2018) and *Byrd v. City of Bossier*, 624 Fed. Appx. 899, 903 fn.3 (5th Cir. 2015).

totality of the circumstances during the arrest. Certainly, this is not a case where Deputy Gordon or the others were "plainly incompetent or … knowingly violate[d] the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). As such, Mr. Carpenter has not proved a Fourth Amendment constitutional infringement, and Deputy Gordon is entitled to qualified immunity on this claim.

### Deputies Gordon and Dickinson's Use of Tasers

Mr. Carpenter alleges that he was tasered three times without resisting arrest. [Doc. 1 at pg. 3 & 9]. Both Deputy Gordon and Deputy Dickinson used their tasers to subdue Carpenter to place him in handcuffs.[104] In addition, Deputy Dickinson deployed his taser only after Deputy Gordon's initial taser deployment was ineffective and unsuccessful. Deputy Dickinson used his Taser to subdue Carpenter so that other Deputies could handcuff him and make an arrest. As discussed below, this use of force was objectively reasonable under the circumstances.

The "question of whether [use of] a taser constitutes excessive force . . . turns on whether the taser is used while the suspect is resisting, as opposed to when the suspect is either not resisting or has ceased resisting." *Pratt v. Harris Cnty.*, 2015 U.S. Dist. LEXIS 4757, at *26 (S.D. Tex. Jan. 15, ). As such, "force, including the use of a taser, is often appropriate or at least entitled to qualified immunity, when the arrestee is resisting or violent." *Id.* (citing *Poole v. City of Shreveport,* 691 F.3d 624, 629 (5th Cir. 2012)).

In *Poole*, the use of a taser to subdue the plaintiff was not excessive because the officer "responded with 'measured and ascending' actions that corresponded to Poole's escalating verbal and physical resistance." *Poole*, 691 F.3d at 629 (citing *Galvan v. City of San Antonio*, 435 F. App'x 309,

---

[104] Carpenter alleges that he was tased three times; however, it is undisputed that Deputy Gordon and Deputy Dickinson were the only two deputies to deploy their tasers during the arrest – and that Deputy Gordon's initial taser deployment resulted in one of the probes not sticking.

311 (5th Cir. 2010)).  The court based this determination on the fact that Poole refused to comply with the officer's repeated commands and that the officer gave verbal commands and attempted to use physical force before resorting to a taser.  *Id.*  The court also noted that the "situation was 'tense, uncertain, and rapidly evolving,' and the officers' decision to use force to restrain Poole was objectively reasonable.  *Id.* (citing *Graham*, 490 U.S. at 396).  The Fifth Circuit further reasoned that Poole posed an immediate threat to the officers' safety and was actively resisting the officer's instruction by failing to turn around and be handcuffed.  *Id.*

> *Deputy Gordon's Taser Use*

Deputy Gordon's use of a taser here is similar to the officer's use of a taser in *Poole* and was thus objectively reasonable.  Deputy Gordon was faced with a "tense, uncertain, and rapidly evolving" arrest of a violent and potentially armed murder suspect.  It is undisputed that Deputy Gordon had announced his presence multiple times and had given Carpenter multiple commands to get on the ground or to show his hands.  It is also undisputed that Carpenter failed to comply with the commands and thus, actively resisted arrest.  In addition, Deputy Gordon had not only used verbal commands prior to deploying his taser, but also a K-9 while attempting to subdue Carpenter.  *See Pratt v. Harris Cnty., Tex. (In re Estate of Pratt)*, 822 F.3d 174 (5th Cir. 2016) (noting "it is important that neither officer used their taser as the *first method* to gain Pratt's compliance.  The record shows that both officers responded with 'measured and ascending actions that corresponded to [Pratt's] escalating verbal and physical resistance.'") (quoting *Poole*, 641 F.3d at 629)).  Despite verbal commands and the use of a K-9, Carpenter continued to resist and gave no signs of surrendering, as he was actively kicking and fighting the K-9.  Carpenter actively resisted before and even during the use of K-9 force; in addition Deputy Gordon's knew that Carpenter was suspected of committing a heinous murder –

and was potentially armed. Deputy Gordon deployed his taser once in an attempt to subdue him. *See Burgess v. Bowers*, 773 Fed. Appx. 238, 248 (6th Cir. 2019).

Indeed, all *Graham* factors weigh in favor of Deputy Gordon's use of his taser to subdue Mr. Carpenter. First, he was suspected of committing murder – killing an elderly woman with a knife. Second, a witness had recently seen him with a knife – and the Deputies did not know whether he was currently armed. Third, he acted aggressively towards the Deputies and gave no indication of surrender. Instead, he threatened the deputies and was an immediate threat to their safety. Finally, Mr. Carpenter repeatedly resisted arrest. He failed to surrender to the deputies' multiple announcements, failed to comply with Deputy Gordon's commands to put his hands in the air or to get on the ground, and continued fighting K-9 Officer Bing.

Deputy Gordon's use of his taser was objectively reasonable under the circumstances. Mr. Carpenter has not shown that Deputy Gordon violated his Fourth Amendment rights, and Deputy Gordon is entitled to qualified immunity.

### *Deputy Dickinson's Taser Use*

Deputy Dickinson deployed his taser after Deputy Gordon's initial deployment was ineffective and unsuccessful, but prior to successfully subduing and handcuffing Mr. Carpenter – who was actively resisting arrest and extremely combative. Under the totality of the circumstances, Deputy Dickinson's use of a taser was not objectively unreasonable.

Deploying multiple tasers to subdue a suspect that was actively resisting arrest did not constitute excess force because the officers responded with "measured and ascending actions that correspond to [the suspect's] escalating verbal and physical resistance." *Pratt*, 822 F.3d at 182 (citing *Poole*, 691 F.3d at 629). Similarly, here, Deputy Dickinson deployed his taser on Mr. Carpenter, a murder suspect, only after (1) he refused to comply with numerous commands; (2) continued to

struggle, resist arrest, and give no sign of surrendering; and (3) Deputy Gordon's initial taser deployment was not effective and failed to subdue Carpenter to subdue and handcuff him. As in *Pratt* and *Poole*, Deputy Dickinson's use of force was measured and ascending to address Carpenter's level of combative resistance. As noted above, all *Graham* factors weigh in favor of Deputy Dickinson's use of the Taser.

Deputy Dickinson's use of force here was objectively reasonable under the circumstances and did not constitute excessive force. Deputy Dickinson is entitled to qualified immunity because Carpenter has not shown a constitutional violation.

### The Jail Defendants Are Also Cloaked with Qualified Immunity

Mr. Carpenter alleges that the Jail Defendants: (1) Provided him with inadequate medical care; (2) Tampered with his mail and denied him access to the courts; and (3) Retaliated against him for seeking redress for grievances by sending letters and filing lawsuits. As set forth below, the defendants are cloaked with qualified immunity, as they did not infringe upon Mr. Carpenter's constitutional rights, and their conduct was objectively reasonable. In addition, these claims are without substantive merit.

### No Infringement of the Plaintiff's Constitutional Rights

### Denial of Adequate Medical Care

Mr. Carpenter alleges that the defendants denied him adequate medical care by: (1) failing to provide him with medical care for his hypertension from August 27, 2015, to December 9, 2015; (2) failing to treat his liver disease; (3) failing to treat numbness in his limbs; and (4) failing to treat him after staff sprayed him with pepper spray. In order to prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must allege facts which demonstrate "deliberate indifference to the serious medical needs of prisoners [which] constitutes 'unnecessary and wanton infliction of pain'

proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors or prison guards in intentionally denying or delaying access to medical care . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104-105, 50 L. Ed. 2d 251, 260 (1976); *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). The test for establishing deliberate indifference is one of "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Under this standard, a state actor may not be held liable under 42 U.S.C. § 1983 unless plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838.

Only in exceptional circumstances may a court infer knowledge of substantial risk of serious harm by its obviousness. *Id.* Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1986), *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668 (1986). This same subjective deliberate indifference standard applies to pre-trial detainees under the Fourteenth Amendment as well as convicted inmates under the Eighth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996).

A prisoner's mere disagreement with medical treatment provided by prison officials does not state a claim against the prison for violation of the Eighth Amendment by deliberate indifference to his serious medical needs. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir.2001), *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). "Deliberate indifference is not established when medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015). Nor is it established by a physician not accommodating a prisoner's requests in a manner he desired – or the prisoner's disagreement with the treatment. *Id.*; *Miller v. Wayback House*, 253 F. App'x 399, 401 (5th Cir. 2007). To

meet his burden in establishing deliberate indifference on the part of medical staff, the plaintiff "must show that [medical staff] refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brauner*, 793 F.3d at 498.

*Hypertension Treatment*

Mr. Carpenter claims that the Jail Defendants failed to provide him with medical care for his hypertension from August 27, 2015, to December 9, 2015. However, his medical request forms show that he made no complaint regarding his symptoms from hypertension until December 5, 2015.[105] In addition, he submitted a medical request form on October 23, 2015 – pertaining to a different health issue – and thus knew the proper procedure for seeking medical care long before December 5, 2015.[106] Mr. Carpenter acknowledges that the defendants immediately set up a doctor's appointment.[107] He was also prescribed two hypertension medications by Dr. Arriola on December 7, 2015 – two days after his report of hypertension symptoms.[108] Jail medication administration records also reveal that he was administered medicine on December 7, 2015, the day it was prescribed.[109] Further, on December 8, 2015, Mr. Carpenter reported to Jailer Josh Hitt that he was having severe symptoms regarding his hypertension.[110] Jailer Hitt immediately responded to the complaints.[111] Mr. Carpenter was ultimately taken to the hospital that night, where he received prescriptions to treat his

---

[105] Exhibit A, at DEF 741.

[106] *Id.* at 742.

[107] *Id.* at 741; [Doc. 1 at pg. 9].

[108] Exhibit B, at DEF 443.

[109] Exhibit A, at DEF 773.

[110] Exhibit C - Jail Reports, at DEF 1734.

[111] *Id.*

hypertension.[112]  Records also reveal that Carpenter was prescribed and received his hypertension

medications every day thereafter.[113] Mr. Carpenter submitted another complaint about his

hypertension on March 13, 2016.[114]  He saw Dr. Arriola two days later – on March 15, 2016.[115]

Again, his medication administration record shows that he was administered his blood pressure

medication daily.[116]

There is no evidence in the record to show that the Jail Defendants were aware that Mr.

Crawford suffered from high blood pressure until December 5, 2015, when he was treated

immediately and on a continuing basis thereafter.  As such, he has not shown that the Jail Defendants

had a subjective knowledge of any substantial risk to him until that date.  The evidence shows that Mr.

Carpenter saw a doctor shortly after his medical request, and that doctor prescribed him medication

for his hypertension.  As such, the Jail Defendants were not deliberately indifferent to Mr. Carpenter's

serious medical needs.  Indeed, the record shows that the Jail Defendants responded quickly,

appropriately, and reasonably to his complaints after he made them aware of each medical problem.

### Liver Disease Treatment

Mr. Carpenter did not make any complaints about his liver disease until submitted his first

medical request form regarding that condition on June 28, 2016.[117]  He saw Dr. Evans on July 14,

2016.[118]  However, the doctor's notes from that day state only that Carpenter was there seeking

---

[112] Exhibit A, at DEF 737.

[113] *See generally, id.*, at DEF 773-880.

[114] Exhibit A, at DEF 736.

[115] *Id.*

[116] *See generally, id.* at DEF 773-880 *and* Exhibit B.

[117] Exhibit A, at DEF 735.

[118] Exhibit D, at DEF 636.

medication for extreme hypertension, not liver disease.[119]  The Jail Defendants thus had no knowledge

of this condition until June 28; they responded quickly and were thus not deliberately indifferent to his

medical issues.  Mr. Carpenter also claims that Defendant Russell violated his constitutional rights by

using in improper medication (krill oil recommended by Dr. Evans) to treat liver disease.  "Deliberate

indifference exists wholly independent of an optimal standard of care."  *Gobert v. Caldwell,* 463 F.3d

339, 349 (5th Cir. 2006).  As set forth above, a prisoner's mere disagreement with a course of treatment

does not rise to the level of a claim for denial of adequate medical care.  *Estelle, supra*; *see also*

*Gibson v. Collier*, 920 F.3d 212, 241 (5th Cir.)  These allegations simply do not state a valid claim for

relief under 42 U.S.C. § 1983.

### Numbness in Legs and Toes

On August 28, 2016, Mr. Carpenter made his first complaint about numbness in his legs and

toes.[120]  He saw Dr. Evans the next day, August 29, 2016.[121]  He submitted another medical complaint

about numbness in his limbs on September 5, 2016.[122]  On September 7, 2016, he saw Dr. Evans

again.[123]  Jail administration records reveal that Mr. Carpenter received his prescribed medications

each day, which included medication for hypertension, liver disease, and numbness in his limbs.[124]

Additionally, his pharmacy record shows that those medications were filled monthly.[125]  The Jail

Defendants were not aware of Mr. Carpenters complaints of numbness in his limbs until August 28,

---

[119] *Id.* at DEF 636; 650.

[120] Exhibit A, at DEF 732.

[121] *Id.* at 732; Exhibit D, at DEF 638-38; 650.

[122] Exhibit A, at DEF 734.

[123] Exhibit B, at DEF 650.

[124] Exhibit A, at DEF 773-880.

[125] *See generally* Exhibit B.

2016, and he was sent to the doctor the next day, as well as on September 7, 2016, for these complaints. As such, these facts do not support a claim for denial of adequate medical care under § 1983.

### Treatment After Being Pepper Sprayed

Mr. Carpenter's allegation that Defendant Russell acted with deliberate indifference by failing to treat him after he was sprayed with pepper spray fails to state a constitution claim. Carpenter was provided with water, shampoo, and towels after the incident – supplies he could use to clean off the chemical agent.[126] In *King v. City of Bossier City*, the district court noted that "to the extent plaintiff claims that he was provided inadequate medical care following the alleged multiple bursts of pepper spray he received immediately prior to his arrest, such claims are dismissed as plaintiff was allowed to rinse out his eyes which shows that defendants were not deliberately indifferent to King's medical needs." 2007 U.S. Dist. LEXIS 44359, at *10 fn.1 (W.D. La. June 19, 2007). Likewise, in *Washington v. Tubbs*, the district court held that the defendants were not deliberately indifferent to that plaintiff's medical needs when they allowed him to take a shower after being sprayed with pepper spray. 2014 U.S. Dist. LEXIS 75636, at *9-*10 (W.D. La. April 21, 2014).

Indeed, in *Baldwin v. Stalder*, 137 F.3d 836, 838 (5th Cir. 1998), the Fifth Circuit found no excessive force when inmates were not permitted to clean during a three-hour bus ride after an officer discharged pepper spray to quell a disturbance in the prison bus. In that case, the court found that, under the circumstances surrounding the incident, waiting three hours until the bus arrived at its destination was reasonable. *Id.* There had been a disturbance at the prison the previous day involving 100 inmates, including all inmates on the bus; the prisoners on the bus were being transferred to a

---

[126] Exhibit C, at DEF 1705-06.

more secure facility as a result of the incident; the bus was parked in an unfenced area near an armory (raising the risk of escape attempts); and the guard was concerned that the inmates could break through the gate separating him from them. *Id*. at 840.

Mr. Carpenter received towels, water, and soap for cleaning off the chemical agent immediately following the incident – just as the plaintiffs in *King* and *Washington* did. Further, there is no evidence to show that he made any further complaints regarding his treatment after being sprayed with the pepper spray. As such, Defendant Russell did not act with deliberate indifference towards Mr. Carpenter. *See e.g., Martin v. Seal*, 510 Fed. App'x 309, 315 (5th Cir. 2013) (finding that inmate failed to establish that employees of a prison were deliberately indifferent after examining plaintiff and offering him a shower after being sprayed by a chemical agent.) This claim for relief is wholly without merit.

### Denial of Access to the Courts

Prisoners possess a constitutional right of access to courts, including having the "ability … to prepare and transmit a necessary legal document to court." *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996), *quoting Brewer v. Wilkinson*, 3 F.3d 816, 821 (5th Cir. 1993), *cert. denied*, 510 U.S. 1123 (1994). The right of access to the courts is limited to allow prisoners opportunity to file nonfrivolous claims challenging their convictions or conditions of confinement. *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999). "Interference with a prisoner's right to access to the courts, such as delay, may result in a constitutional deprivation." *Chriceol v. Phillips*, 169 F.3d 313, 317 (5th Cir. 1999) (citations omitted).

However, "[a] denial-of-access-to-the-courts claim is not valid if a litigant's position is not prejudiced by the alleged violation." *Ruiz v. United States*, 160 F.3d 273, 275 (5th Cir. 1998); *Henthorn v. Swinson*, 955 F.2d 351, 354 (5th Cir. 1992), *cert. denied,* 504 U.S. 988 (1992), citing

*Richardson v. McDonnell*, 841 F.2d 120, 122 (5th Cir. 1988). It is only when a prisoner suffers some sort of actual prejudice or detriment from denial of access to the courts that the allegation becomes one of constitutional magnitude. *Walker v. Navarro County Jail*, 4 F.3d 410, 413 (5th Cir. 1993); *see Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987). To prove his claim, a plaintiff must show real detriment – a true denial of access – such as the loss of a motion, the loss of a right to commence, prosecute or appeal in a court, or substantial delay in obtaining a judicial determination in a proceeding. *See Oaks v. Wainwright*, 430 F.2d 241 (5th Cir. 1970).

In this case, Mr. Carpenter alleges that he could not communicate through the mail with an attorney. First, an inmate's representation by an attorney in his criminal case is, alone, sufficient access to the courts. *Lewis v. Casey*, 518 U.S. 343, 356 (1996). Further, Mr. Carpenter has not stated that the alleged interference with his mail prejudiced a legal position. In any event, Mr. Carpenter was able to file in instant suit and engage in a brisk motion practice during his stay at the Itawamba County Jail. For these reasons, the plaintiff's claim of denial of access to the courts should be dismissed for failure to state a constitutional claim.

### Mail Tampering

To prevail on his claim of unconstitutional mail tampering, a prisoner plaintiff must prove: (1) that the prison officials intentionally confiscated his outgoing mail, and (2) that the confiscation of the plaintiff's mail resulted in actual harm to him. *Wolff v. McDonnell*, 418 U.S. 539, 575-77 (1974), *Brewer v. Wilkerson*, 3 F.3d 816, 824-25 (5th Cir. 1993), *Lewis v. Casey*, 518 U.S. 343, 349 (1996), *Jones v. Greninger*, 288 F.3d. 322, 325 (5th Cir. 1999). In this case, Defendant Russell confiscated

Mr. Carpenter's "mail"[127] after he attempted to smuggle it out of the jail through another inmate and that the letters were "threatening the officers."[128]  It is clear that "[a] prison official's interference with a prisoner's legal mail . . . may violate the prisoner's First Amendment right to free speech."  *Young*, 2020 U.S. Dist. LEXIS 108463, at *48.  However, there is a "legitimate penological need for prison 'personnel to open, review, and occasionally censor outgoing mail' because of concerns about possible threats to prison security."  *Id.* at *48-49 (quoting *Franco v. Collins*, 2015 U.S. Dist. LEXIS 1806, 2015 WL 136544, at *1 (S.D. Tex. Jan. 8, 2015)).  In this case, Mr. Carpenter's letters were confiscated because they "contain[ed] information to ex jailer *[sic]* about employed jailers" and "threaten[ed] the officers."[129]  Jail staff thus confiscated Carpenter's letters due to "concerns about possible threats to prison security[,]" which is a legitimate penological interest.  *Young v. Leblanc*, 2020 U.S. Dist. LEXIS 108463, at *48-49 (E.D. La. May 7, 2020).  In addition, Mr. Carpenter has not identified any harm he suffered as a result of the confiscation of the threatening letters; hence, under *Wolff, supra*, his claim for mail tampering also fails.

**Retaliation**

Mr. Carpenter alleges that on January 16, 2016, Sheriff Dickerson threatened to kill him if he wrote another civil lawyer and filed a lawsuit.  Thus, Carpenter alleges that Sheriff Dickerson retaliated against him for seeking redress for grievances.  Prison officials may not retaliate against prisoners for exercising their constitutional rights.  *Morris v. Powell*, 449 F.3d 682, 684 (5th Cir.

---

[127] Mr. Carpenter's decision to skirt the jail's system of handling inmate mail by smuggling the letters out through another inmate calls into question whether the letters even qualified as "mail" for the purposes of this discussion.  This claim is nonetheless without substantive merit no matter how the court construes the letters; as such, the court will not consider whether the letters were "mail."

[128] Exhibit C, at DEF 1705.

[129] *Id.* at 1705-06.

2006).  On the other hand, courts must view such claims with skepticism to keep from getting bogged down in every act of discipline prison officials impose.  *Id*.  The elements of a claim under a retaliation theory are the plaintiff's invocation of "a specific constitutional right," the defendant's intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, *i.e.*, "but for the retaliatory motive the complained of incident . . . would not have occurred."  *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir.1995) (citations omitted ), *cert. denied*, 516 U.S. 1084, 116 S. Ct. 800, 133 L. Ed. 2d 747 (1996).

A prisoner seeking to establish a retaliation claim must also show that the prison official's conduct was sufficiently adverse so that it would be capable of deterring a person of ordinary firmness from exercising his constitutional rights in the future.  *Winding v. Grimes*, 4:08CV99-FKB, 2010 WL 706515 at 3 (S.D. Miss. Feb. 22, 2010); *citing Morris v. Powell*, 449 F.3d 682, 684–85 (5th Cir. 2006) at 685.  A single incident involving a minor sanction is insufficient to prove retaliation.  *Davis v. Kelly*, 2:10CV271-KS-MTP (citing *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999), 2:10CV271-KS-MTP, 2012 WL 3544865 *Id.*).  Similarly, inconsequential (*de minimis*) acts by prison officials do not give rise to an actionable retaliation claim.  *See Morris* at 685.

In this case, Mr. Carpenter must prove that he engaged in constitutionally protected activity (seeking redress for grievances), faced significant adverse consequences, and that such action was taken "in an effort to chill [his] access to the courts or to punish [him]for having brought suit."  *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1296 (5th Cir.), *cert. denied*, 513 U.S. 926, 115 S. Ct. 312, 130 L. Ed. 2d 275 (1994); *see also Serio v. Members of Louisiana State Board of Pardons*, 821 F.2d 1112, 1114 (5th Cir.1987).  The showing in such cases must be more than the prisoner's "personal belief that he is the victim of retaliation."  *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995).  *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).

The Fifth Circuit has made clear the dangers of permitting retaliation claims to proceed in the absence of factual allegations to support an inference of a retaliatory motive. In *Whittington v. Lynaugh*, 842 F.2d 818, 819 (5th Cir. 1988), the plaintiff, Daniel Johnson, had filed numerous lawsuits against administrators and staff within the Texas prison system. The defendants then denied Johnson's request to have his custody status upgraded, and Johnson alleged that the denial was in retaliation for filing his previous suits. *Id.* The Fifth Circuit rejected Johnson's claim – and explained why courts must insist upon specific factual allegations to support an inference of retaliation:

> If we were to hold that [Johnson] by his allegations in this case had established a case which was entitled to the full panoply of discovery, appointment of counsel, jury trial and the like, we would be establishing a proposition that would play havoc with every penal system in the country. Prison administrators must classify and move prisoners. It is a virtual truism that any prisoner who is the subject of an administrative decision that he does not like feels that he is being discriminated against for one reason or another, such as the past filing of a grievance, a complaint about food or a cellmate, or a prior complaint that he was not being treated equally with other prisoners. If we were to uphold the further pursuit of [Johnson's] complaint in this case we would be opening the door to every disgruntled prisoner denied the next level of trustyship, reassigned to another prison job, moved to another cell, [or] claiming his shoes were uncomfortable, to bring such a suit.

*Whittington v. Lynaugh*, 842 F.2d 818, 819 (5th Cir. 1988). For example, prisoners routinely file grievances and lawsuits against prison staff on an ongoing basis, for any number of reasons. As such, it is not uncommon for a prisoner to file a suit, then receive a Rule Violation Report sometime thereafter. Thus, to avoid turning nearly every charge of prison rule violations against a prisoner into a claim of retaliation, courts insist upon additional allegations or evidence to substantiate a retaliation claim, such as prison staff issuing threats of disciplinary action if an inmate files further grievances, staff members pulling an inmate aside to threaten him, members of prison staff perpetrating unprovoked acts of violence against an inmate, or prison staff members wholly fabricating charges of prison rule violations against an inmate. *See Decker v. McDonald*, 2010 WL 1424322 (E.D. Tex.

2010) (Magistrate Judge's Report and Recommendation) (unpublished), adopted by the District Court, 2010 WL 1424292 (E.D. Tex.) (unpublished).

First, as a general proposition, verbal threats do not rise to the level of a constitutional violation. *See Calhoun v. Hargrove,* 312 F.3d 730, 734 (5th Cir. 2002). Indeed, "mere threatening language or gestures of a custodial officer do not, even if true, amount to constitutional violations." *Robertson v. City of Plano, Tex.*, 70 F.3d 21, 24 (5th Cir. 1995) (alteration omitted); *see Hines v. Cain*, 2007 WL 891880 at *4 (E.D. La. Mar. 20, 2007) (collecting cases); *see also Hudson v. Univ. of Tex. Medical Branch*, 441 Fed.App'x. 291, 292–93 (5th Cir. 2011) (finding that mere threats fail to support a claim of retaliation). A prison official's mere use of threatening language, without more, does not constitute a retaliatory adverse act; instead, a prisoner seeking to prove a claim of retaliation must show that he "suffered a concrete, tangible harm." *Hudson v. Univ. of Tex. Med. Branch*, 441 F. App'x 291, 293 (5th Cir. 2011).

In addition, Mr. Carpenter's "[m]ere conclusory allegations of retaliation are not enough" to sustain a § 1983 claim for retaliation. *Langley v. Brown*, 2016 U.S. Dist. LEXIS 151274, at *30 (E.D. La. Aug. 8, 2016) (quoting *Decker v. McDonald*, No. 5:09cv27, 2010 U.S. Dist. LEXIS 34400, 2010 WL 1424322, at *15 (E.D. Tex. Jan. 11, 2010)). Further, he has not shown any actual injury or actual infringement of his constitutional rights arising out of the alleged retaliation. *Id.* at *32. Mr. Carpenter has filed the instant lawsuit, communicated with the court, and actively prosecuted his case–all of which occurred after the alleged retaliation. As such, Mr. Carpenter has not established a "violation of a specific constitutional right as a result of any allegedly retaliatory acts." *Id.* at *33. This claim is without substantive merit.

**No Valid Claim Against Defendant Dwight Hill**

The claims Mr. Carpenter is attempting to make against Jailer Dwight Hill are unclear. Indeed, Mr. Carpenter has not alleged any cognizable constitutional claim against Defendant Hill. Mr. Carpenter makes no factual allegations that Defendant Hill used excessive force, provided him with inadequate medical attention, tampered with mail, obstructed his access to the court, or retaliated against him (the only claims remaining in this case). As such, Mr. Carpenter has not alleged a constitutional violation against Defendant Hill, and judgment will be entered in Defendant Hill's favor.

### Defendants' Conduct Was Objectively Reasonable

As discussed above, all defendants in this case enjoy qualified immunity because Mr. Carpenter has not alleged an infringement of a clearly established constitutional right. The next question in the qualified immunity inquiry is whether the defendants' conduct was objectively reasonable. A defendant's acts are "*deemed* to be 'objectively reasonable' unless all reasonable officials in the defendant's circumstances would have known that the conduct at issue violated clearly established law." *Thompson v. Miss. Dep't of Corr.*, 2017 U.S. Dist. LEXIS 132387, *13 (N.D. Miss. Aug. 17, 2017) (citing *Thompson v. Upshur County, Texas*, 245 F.3d 447, 456 (5th Cir. 2001)) (emphasis added). As such, "'[p]re-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.'" *Id.* at *13-*14 (quoting *Pasco v. Knoblauch*, 566 F.3d 572, 578-579 (5th Cir. 2009) (citing *Pierce v. Smith*, 117 F.3d 866, 882 (5th Cir. 1997)). As discussed in detail in the sections above, the defendants' conduct was objectively reasonable; certainly none of them were plainly incompetent or intentionally violated the law. *See*

*Malley v. Briggs*, 475 U.S. 335, 341 (1986).[130]  As a result, they all enjoy qualified immunity from suit.

**Conclusion**

For the reasons set forth above, the defendants enjoy qualified immunity because, as to each of his claims, the plaintiff has neither alleged an infringement of a clearly established constitutional right, nor shown that the defendants' actions were objectively unreasonable under the circumstances.  *See* . *Heitschmidt v. City of Houston*, 161 F.3d 834, 836–37 (5th Cir.1998).  In addition, as discussed at length in the various sections regarding objective reasonableness above, even if the defendants were not shielded by qualified immunity, all of the plaintiff's claims fail on the merits.  For these reasons, the defendants' motions [80], [82] for summary judgment will be granted, and judgment will be entered in favor of the defendants in all respects.  A final judgment consistent with this memorandum opinion will issue today.

   **SO ORDERED**, this, the 11th day of April, 2022.

         /s/   Roy Percy
         UNITED STATES MAGISTRATE JUDGE

---

[130] The plaintiff's allegations against Dwight Hill simply do not state any cognizable constitutional claim.